IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
CHATTANOOGA DIVISION

| | |
|---|---|
| THUNDERBALL AVIATION, LLC, a Delaware limited liability company, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) C.A. No.: _____ <br>) |
| SOUTHERN AVIATION SYSTEMS, LLC, a Florida limited liability company, | )<br>)<br>)<br>) |
| Defendant. | )<br>)<br>) |

## COMPLAINT

ThunderBall Aviation, LLC ("ThunderBall"), brings this action against Southern Aviation Systems, LLC ("SAS"), pursuant to an Aircraft Purchase and Sale Agreement, dated as of December 2020 (the "APSA" or the "Agreement"), to compel SAS to authorize the release of funds held in escrow to pay the cost of the correction and repair of "Inspection Discrepancies," as required by the APSA. ThunderBall also seeks, in the alternative, damages for breach of contract and attorneys' fees and expenses as provided for in the APSA. Finally, ThunderBall seeks, in the alternative, declaratory judgment that SAS breached the APSA by refusing the release all of any portion of the escrow funds.

### Parties

1.  ThunderBall is a Delaware limited liability company with its primary place of business at 110 Draper Rd., NW, Suite B, Blacksburg, Virginia, whose members are not citizens of Tennessee. ThunderBall is a citizen of Virginia.

1

4879-7272-7591

Case 1:22-cv-00184-CLC-CHS   Document 1   Filed 07/12/22   Page 1 of 13   PageID #: 1

2. SAS is a Florida limited liability company and maintains an office at 2401 PGA Blvd., Suite 200, Palm Beach Gardens, Florida. SAS can be served through its registered agent, Charles Gusmano, at 1601 Belvedere Rd., Suite S-202, West Palm Beach, Florida 33406.

## Jurisdiction and Venue

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 in that the matter in controversy is between citizens of different states and exceeds the sum or value of $75,000, exclusive of interest and costs.

4. Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(2) because substantial parts of the events giving rise this action took place in this district.

5. This Court may exercise personal jurisdiction over SAS because this action arises from business transacted by SAS in Chattanooga, Tennessee. SAS agreed that the inspection of the Aircraft and the correction of Inspection Deficiencies would be, and were, performed by WestStar Aviation located in Chattanooga, Tennessee ("WestStar"). Representatives of SAS travelled to WestStar's facility in Chattanooga on February 8, 2021, to meet with WestStar representatives and discuss the inspection of the Aircraft and the correction of the Inspection Deficiencies. Representatives of SAS participated in a continuous course of communication with WestStar (in Chattanooga) and ThunderBall regarding the inspection and the correction of the Inspection Deficiencies. Pursuant to APSA §§3.1 and 3.2, the inspection of the Aircraft was performed by WestStar in Chattanooga. Pursuant to APSA § 3.4, the correction of the Inspection Deficiencies was performed by WestStar in Chattanooga.

6. SAS was represented by Jet Evolution, LLC ("Jet Evolution") in the offer of the Aircraft for sale. Jet Evolution is a Virginia limited liability company.

**Facts**

7. ThunderBall and SAS are parties to the APSA.[1]

8. APSA Article II provides for ThunderBall to purchase an airplane identified as a Dassault Aviation Model FALCON 2000 aircraft, United States Registration No. N923AL (the "Aircraft") from SAS.

9. APSA Article III provides for the condition of the Aircraft, the inspection of the Aircraft, and the correction of "Inspection Deficiencies."

10. APSA Article I defines the terms used in the Agreement.

    a. Section 1.1 defines "Aircraft Technical Condition" as "the condition set forth in **Exhibit A** attached hereto as of the Closing Date." Exhibit A, Aircraft Technical Condition", states technical requirements the Aircraft must meet, including:

> 3.1.4 current on the manufacturer's recommended maintenance programs through the Closing Date (including all calendar, cycle and hourly inspections for which compliance is required on or before the Closing Date);
>
> 3.1.5 with all systems and installed equipment, Engines and APU in Normal Working Order and operating within manufacturer's tolerance and limitations;
>
> 3.1.6 in compliance with all applicable FAA airworthiness directives and applicable mandatory service bulletins (or manufacturer's equivalent), that have been issued with respect to the Aircraft for which compliance is required on or prior to the Closing Date.

    b. Section 1.1 defines "Holdback Amount" as "the sum of Five Hundred Thousand United States Dollars (USD $500,000.00)."

---

[1] ThunderBall is not attaching the APSA to the Complaint because it contains a confidentiality clause. The Complaint discusses specific APSA provision as required to enforce ThunderBall's rights under or relating to the APSA and to pursue available remedies for breach of the APSA by SAS. APSA, 7.22

c. Section 1.1 defines "Inspection" as "Purchaser's post-purchase inspection of the Aircraft as set forth in Section 3.1 hereof."

d. Section 1.1 defines "Inspection Discrepancy" as "any item discovered during the Inspection that must be corrected or repaired in order for the Aircraft to be placed in the Aircraft Technical Condition, as determined by the Inspection Facility; provided, however, that Seller's obligation to correct any items listed on the Notice of Discrepancies is limited solely to those items that must be corrected or repaired in order for the Aircraft to be placed in the Aircraft Technical Condition notwithstanding that Purchaser may list other items therein (such as cosmetic or aesthetic items) that do not meet such requirement; and further provided, however, that the term "Inspection Discrepancy" shall be deemed to include any discrepancies from the Aircraft Technical Condition to the extent arising out of any circumstance relating to or arising after Closing; and further provided, however, that in the event that if any modifications are made to the Aircraft after Closing, Seller's obligation under Article III shall be deemed waived and the Holdback Amount shall promptly be remitted by the Escrow Agent to Seller.

e. Section 1.1 defines "Inspection Facility" as "WestStar Aviation, Chattanooga, Tennessee."

f. Section 1.1 defines "Inspection Report" as the final written report generated by the Inspection Facility following the Inspection.

g. Section 1.1 defines "Normal Working Order" and "operating in accordance with (or within) manufacturer's specifications" as "a condition which (i) is consistent with the standard specifications, limitations and requirements of the maintenance and/or operations manual applicable to the unit, and (ii) is good, but not necessarily perfect, it

being understood and agreed that normal wear and tear within the manufacturer's maintenance manual limitations for normal use which does not materially impair performance of the unit or prevent return to service shall be acceptable."

h. Section 1.1 defines "Notice of Discrepancies" as a "Notice of Discrepancies in the form of Exhibit B attached hereto."

11. APSA §§ 3.1 and 3.2 provide for the post-purchase inspection of the Aircraft.

12. APSA Section 3.1 provides:

> **Post-Purchase Inspection.** Following Closing, the Aircraft and Aircraft Documents shall be subjected to an Inspection, which shall be undertaken at Purchaser's sole cost and expense, in order to verify through the Inspection that the Aircraft is in the Aircraft Technical Condition and such inspection shall be in the form and scope described on **Exhibit G** hereto (collectively, the "**Inspection**"). Purchaser shall bear the cost of the Inspection. Seller's and Purchaser's representatives shall have the right to observe the Inspection and monitor its progress, subject to applicable pandemic and other protocols of the Inspection Facility. Purchaser and Seller will each authorize the Inspection Facility to communicate with all parties and share all discrepancy lists, work orders and updates simultaneously.

Exhibit G is an outline of the inspection process, technical criteria, and avionics/electrical functional evaluation.

13. APSA Section 3.2 provides:

> **Inspection Location and Commencement.** Purchaser shall cause the Inspection to be performed at the Inspection Facility commencing within five (5) Business Days after Closing or at the Inspection Facility's first availability thereafter (the "**Inspection Commencement Date**") and Purchaser shall use its best efforts to cause the Inspection Facility to conclude the Inspection as soon as practicable after commencement. Purchaser shall position the Aircraft to the Inspection Facility within five (5) Business Days after Closing where it shall remain (and not be flown) until commencement of the Inspection.

14. APSA § 3.3 provides:

>    **Inspection Report.** By 5:00pm Eastern Time on the third (3rd) Business Day after completion of the Inspection and receipt by Purchaser and Seller of the Inspection Report, Purchaser shall execute and deliver to Seller the Escrow Agent a Notice of Discrepancies, and shall therein identify Inspection Discrepancies. Failure to deliver the Notice of Discrepancies by the end of such time period shall be deemed a waiver of Seller's obligations to bear the expense of repair of Inspection Discrepancies pursuant to Section 3.4 hereof.

15. APSA § 3.4 provides:

>    **Correction of Inspection Discrepancies/Holdback.** As soon as reasonably practicable after receipt by Seller of the Notice of Discrepancies, Purchaser shall cause the Inspection Discrepancies to be corrected by the Inspection Facility, as evidenced by the Aircraft's Return to Service by appropriate logbook entries, at Seller's expense (to the extent not covered by the Maintenance Programs) from the Holdback Amount. In the event the Holdback Amount is insufficient to fully cover the cost of the Inspection Discrepancies, the Seller shall not be responsible to fund the excess. Purchaser shall coordinate authorizations to the Inspection Facility with Seller. Seller and Purchaser agree that the Holdback Amount from the proceeds from the sale of the Aircraft shall be held in escrow (the "**Escrow Funds**") by the Escrow Agent, to be released as set forth herein. The parties shall authorize the Escrow Agent to disburse from the Escrow Funds amounts necessary for the payment of the Inspection Facility's invoice for the correction or repair of the Inspection Discrepancies to the extent not covered by the Maintenance Programs. To the extent that there are any remaining Escrow Funds after payment of the Inspection Facility's invoice, the parties shall authorize the Escrow Agent to disburse such remaining sum to Seller. The provisions of this Section 3.4 shall survive Closing. If the Aircraft is conveyed by Purchaser to a third party after Closing and prior to the issuance of the Inspection Report, then the Escrow Funds will be returned to the Seller in full and Seller shall have no further obligation hereunder.

16. SAS delivered the Aircraft pursuant to APSA § 4.2 on December 30, 2020.

17. Following the delivery of the Aircraft, WestStar undertook the Inspection as the Inspection Facility designated by the APSA § 1.1.

6

18. By email dated January 11, 2021, ThunderBall's representative requested that WestStar circulate discrepancy lists, work orders and updates to SAS.

19. On February 2, 2021, WestStar circulated a list of discrepancies found during the Post Purchase Inspection to ThunderBall and SAS.

20. ThunderBall delivered the Notice of Post Purchase Inspection Discrepancies to SAS on February 5, 2021. A copy of this Notice is attached as **<u>Exhibit 1</u>**.

21. On February 8, 2021, WestStar circulated the "latest discrepancy list generated by the PPI" to ThunderBall and SAS.

22. On February 18, 2021, counsel for ThunderBall provide counsel for SAS with a copy of the updated discrepancy list circulated by WestStar on February 8, 2021.

23. The discrepancy lists WestStar provided were in the form of an "Estimated Work Summary." The WestStar Estimated Work Summary document includes the statement:

> **These are Estimates only.** This Summary is not a total of all expenses which will be charged for this aircraft. Flat Rated labor will be billed at the quoted amount required to perform the work. Estimates of the cost of work which is noted to be performed on a Time and Materials basis are subject to change. The final cost of each Time and Materials item will be based on the actual materials, parts, labor and outside services required to complete the item. Freight, sales tax and similar items will be charged in addition to Flat Rated and Time and Materials.

24. The individual items listed in the WestStar Estimated Work Summary stated, where appropriate, that the estimated changes were subject to additional evaluation and could require additional engineering review, parts, fabrication, and mechanical work. The work and materials needed to correct these items were worked on on a "time and materials" basis.

25. SAS representatives met with WestStar representatives at the WestStar facility in Chattanooga, Tennessee on February 8, 2021, to discuss the list of discrepancies. No representative of ThunderBall attended that meeting.

26. On February 22, 2021, SAS's counsel sent ThunderBall's counsel an email responding to ThunderBall's February 18, 2021 letter and the February 8, 2021 WestStar Estimated Work Summary. This email states: "Except for the items identified on the attached summary, as of February 8, 2020, Seller approved all of the items listed on the work summary." The summary attached to the SAS email was entitled: "Post/Pre-Buy inspection of Falcon 2000 S/N: 083." This summary listed 17 items that SAS had not yet approved for several different reasons. *See* **Exhibit 2**.

27. WestStar proceeded with the work to correct the Inspection Discrepancies listed in the February 5, 2021 Notice of Post Purchase Inspection Discrepancies and the WestStar Estimated Work Summaries, pursuant to APSA § 3.4.

28. As WestStar proceeded with the work, it provided reports and updates to ThunderBall and SAS.

29. ThunderBall and SAS were not able to reach an agreement with respect to the 17 items listed in SAS's February 22, 2022 Post/Pre-Buy inspection of Falcon 2000 S/N: 083.

30. ThunderBall coordinated authorizations to WestStar with SAS as provided for in APSA § 3.4, including, but not limited to, the correspondence of February 8, 2021, February 18, 2021, and February 22, 2021 noted above.

31. On September 10, 2021, WestStar provided its Preliminary Invoice, dated September 10, 2021, to ThunderBall and SAS.

32. On September 14, 2021, SAS requested that WestStar provide additional information about the WestStar September 10, 2021 Preliminary Invoice.

33. On September 22, 2021, ThunderBall's counsel requested to SAS's counsel to arrange for the disbursement of the Escrow Funds.

34. WestStar provided additional information to SAS on or about September 28, 2021.

35. On September 28, 2021, WestStar provided an updated invoice for payment in the amount of $493,539.88. A copy of WestStar's invoice is attached as **Exhibit 3**.

36. On October 11, 2021, ThunderBall's counsel renewed the request that SAS join in arranging the disbursement of the escrowed funds.

37. Counsel for SAS responded on October 11, 2021, stating that Southern Aviation was reviewing the materials provided and further stating certain objections to the inspection process. SAS also stated: "With respect to your comment about WestStar being paid, WestStar is not the Seller's responsibility."

38. On October 14, 2021, ThunderBall, by counsel, notified SAS, by counsel, that SAS's continued delay was a breach of the APSA and that all requirements for the release of the escrow funds had been satisfied and those funds should be immediately available to pay WestStar.

39. SAS did not authorize the release of all or any portion of the Escrow Funds to pay the cost of correcting the Inspection Deficiencies.

40. SAS's actions deprived ThunderBall of the use of the Aircraft.

41. On November 16, 2021, ThunderBall, by counsel, notified SAS, by counsel, that ThunderBall would proceed to pay WestStar's invoice to mitigate its damages resulting from SAS's refusal to release the Escrow Funds.

42. ThunderBall paid WestStar's invoice of $493,539.88 and WestStar released the Aircraft.

43. The WestStar invoice included several work items that were not listed in on the WestStar Estimated Work Summary After adjustment for these items, the cost of the correction of Inspection Deficiencies totaled $476,699.07.

44. SAS's failure to authorize the release of the Escrow Funds to pay WestStar's invoice breached SAS's obligations pursuant to APSA § 3.4.

45. SAS's failure to authorize the release of the Escrow Funds to pay WestStar's invoice has damaged ThunderBall in at least the following ways:

    a. The Escrow Funds were not timely available to pay the Inspection Facility's (WestStar) invoice for the cost of correcting the Inspection Discrepancies, as provided for in APSA § 3.4. Therefore, in order to have the Inspection Facility release the Aircraft so that ThunderBall could have the benefit of its bargain under the APSA, ThunderBall had to pay the WestStar invoice for the cost of correcting the Inspection Deficiencies.

    b. ThunderBall was deprived of the use of and access to the Aircraft.

    c. ThunderBall has incurred attorneys' fees in asserting its claims under the APSA.

## Count I – Breach of Contract and Specific Performance

46. ThunderBall realleges the allegations stated above as if fully set forth below.

47. APSA § 3.4 specifically provides that the parties shall authorize the Escrow Agent to disburse the Escrow Funds for the payment of WestStar's invoice for the correction or repair of the Inspection Deficiencies.

48. SAS's actions deprived ThunderBall of use of and access to the Aircraft, forcing ThunderBall to advance payment to Westar for correcting the Inspection Deficiencies.

49. ThunderBall does not have an adequate remedy at law because the funds designated for use to pay Westar for correcting the Inspection Deficiencies have not been released from escrow by SAS.

50. Specific performance is necessary to accomplish the release of the Escrow Funds as necessary to pay the cost of correcting the Inspection Discrepancies.

51. By reason of its actions as stated above, SAS has breached its contractual obligations to ThunderBall with respect to the payment of the WestStar invoice and the use of the Escrow Funds.

### **Count II – Breach of Contract and Claim for Damages (Alternative Relief)**

52. ThunderBall realleges the allegations stated above as if fully set forth below.

53. In the alternative, by reason of its actions as stated above, SAS has breached its contractual obligations to ThunderBall with respect to the payment of the WestStar invoice and the use of the Escrow Funds.

54. ThunderBall has incurred and will incur damages as a result of SAS's breach of contract in an amount of at least $476,699.

### **Count III – Declaratory Judgment (Alternative Relief)**

55. ThunderBall realleges the allegations stated above as if fully set forth below.

56. In the alternative, an actual controversy exists between ThunderBall and SAS with respect to the availability of the Escrow Funds to pay the cost of correcting the Inspection Deficiencies and the resulting damages and expenses incurred by Thunderball.

57. ThunderBall seeks a declaration that:

    a. ThunderBall is entitled to the release of the Escrow Funds.

    b. SAS has the duty to authorize the release of the Escrow Funds.

11

4879-7272-7591
Case 1:22-cv-00184-CLC-CHS   Document 1   Filed 07/12/22   Page 11 of 13   PageID #: 11

## **Prayer for Relief**

WHEREFORE, the Plaintiff ThunderBall Aviation, LLC demands judgment against the Defendant Southern Aviation Systems, LLC as follows:

A. An Order of specific performance directing SAS to authorize the Escrow Agent to disburse from the Escrow Funds an amount necessary to reimburse ThunderBall for the cost to pay WestStar's invoice for the correction and repair of the Inspection Discrepancies under APSA § 3.4. in an amount of at least $476,699.

B. In the alternative, an award of damages caused by SAS's actions including, but not limited to, the cost to pay WestStar's invoice, additional financing and insurance costs incurred by ThunderBall, and damages from the unavailability of the Aircraft in an amount of at least $476,699.

C. In the alternative, a judgment in favor of ThunderBall in an amount of at least $476,699, together with such pre-judgment interest, post-judgment interest, expenses, and costs as may be established at trial.

D. Award ThunderBall all costs and expenses incurred in connection with this action including, pursuant to APSA § 7.11, reasonable attorneys' fees and expenses.

E. A declaratory judgment that:

1. ThunderBall is entitled to the release of the Escrow Funds.
2. SAS has the duty to authorize the release of the Escrow Funds.

F. Grant ThunderBall such other and further relief as the Court deems just and equitable.

Respectfully submitted,

**BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC**

By: s/Cameron S. Hill
Cameron Hill (BPR # 017408)
633 Chestnut Street, Suite 1900
Chattanooga, TN 37450
(423) 209-4160
chill@bakerdonelson.com

*Attorneys for ThunderBall Aviation, LLC*

**GENTRY LOCKE**

Gregory J. Haley (VSB No. 23971)
David R. Berry (VSB No. 90554)
10 Franklin Road S.E., Suite 900
P.O. Box 40013
Roanoke, Virginia 24022
Phone: (540) 983-9300
Fax: (540) 983-9400
haley@gentrylocke.com
berry@gentrylocke.com

*Motions for Pro Hac Vice admission to be submitted*